CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

APR 2 4 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

TRAVIS R. MCLAUGHLIN,   )
            )
  Plaintiff,      )
            ) Civil Action No. 5:11cv027
v.           )
            )
MICHAEL J. ASTRUE,    ) By: Michael F. Urbanski
Commissioner of Social Security, )  United States District Judge
            )
  Defendant.     )

## MEMORANDUM OPINION

This social security disability appeal is before the court for review of the Report and Recommendation issued in this case by the magistrate judge on October 13, 2011. In that Report and Recommendation, the magistrate judge concludes that the assessments and opinions of the reviewing state agency physicians and consultative examining physician do not support the administrative law judge's ("ALJ") determination that plaintiff Travis McLaughlin ("McLaughlin") is not disabled. The magistrate judge reasons that the reviewing physicians and the consultative examiner did not have the benefit of an assessment performed by McLaughlin's treating psychiatrist, Dr. Robinson, when issuing their opinions; thus, remand is appropriate. Having carefully reviewed the record, it is clear to the court that the ALJ took into account Dr. Robinson's assessment in addition to the opinions of the reviewing state agency physicians and the consultative examiner, and that substantial evidence supports the ALJ's determination that McLaughlin is not disabled. As such, the magistrate judge's recommendation will be rejected in its entirety and the Commissioner's decision affirmed.

# I.

This matter was referred to the magistrate judge for proposed findings of fact and

recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) on June 9, 2011.  The

parties filed cross motions for summary judgment and supporting memoranda and the magistrate

judge issued his Report and Recommendation on October 13, 2011.  Under 28 U.S.C.

§ 636(b)(1), the "court may accept, reject, or modify, in whole or in part, the findings and

recommendations made by the magistrate judge."  Federal Rule of Civil Procedure 72(b)

provides the parties with an opportunity to file written objections to the proposed findings and

recommendations, but neither party filed objections in this case.  Rule 72(b)(3) provides that the

"district judge must determine de novo any part of the magistrate judge's disposition that has

been properly objected to."  While the text of the rule is silent as to the obligation of the court if

no objection is made, the advisory committee notes that "[w]hen no timely objection is filed, the

court need only satisfy itself that there is no clear error on the face of the record in order to

accept the recommendation."  Advisory Committee Notes to Fed. R. Civ. P. 72 (citing Campbell

v. United States Dist. Court, 501 F.2d 196, 206 (9th Cir. 1974)).  In Thomas v. Arn, 474 U.S.

140 (1985), the Supreme Court had occasion to address the issue, and stated as follows:

> The district judge has jurisdiction over the case at all times.  He
> retains full authority to decide whether to refer a case to the
> magistrate, to review the magistrate's report, and to enter
> judgment.  Any party that desires plenary consideration by the
> Article III judge of any issue need only ask.  Moreover, while the
> statute does not require the judge to review an issue de novo if no
> objections are filed, it does not preclude further review by the
> district judge, sua sponte or at the request of a party, under a de
> novo or any other standard.

474 U.S. at 154.  Thus, even absent an objection, the court retains the ability to review sua

sponte a magistrate judge's report and recommendation.  The court believes that the particular

Case 5:11-cv-00027-MFU-BWC   Document 18   Filed 04/24/12   Page 2 of 18   Pageid#: 440

facts of this case present an appropriate occasion to review the magistrate judge's Report and Recommendation notwithstanding the absence of an objection.

## II.

Plaintiff's arguments on appeal concern the weight given by the ALJ to a mental impairments questionnaire filled out by McLaughlin's treating psychiatrist, Dr. Robinson, on January 19, 2010. On this questionnaire, Dr. Robinson stated that McLaughlin suffers from a mood disorder, not otherwise specified; rule out bipolar disorder, not otherwise specified, severe. Dr. Robinson indicated that McLaughlin is "unable to function in social/occupational realms due to mood instability, irritability, ruminative/anxious thoughts." (R. 298.) She noted that he has a low IQ or reduced intellectual functioning as a result of a learning disability. (R. 301.) She pegged his current GAF at 52 and his highest GAF in the past year at 60.[1] (R. 298.)

In terms of his functional limitations, Dr. Robinson stated that McLaughlin has moderate restriction of activities of daily living; extreme difficulties in maintaining social functioning; extreme difficulties in deficiencies of concentration, persistence or pace; and that he had three episodes of decompensation within a twelve month period, each of at least two weeks duration. (R. 302.) She anticipated McLaughlin's impairments would cause him to be absent from work more than four days per month, essentially precluding all work activity. (R. 303; see also R. 67.)

Specifically, Dr. Robinson opined that McLaughlin has no useful ability to function in a number of areas required for unskilled work, including maintaining attention for a two hour segment; maintaining regular attendance; and completing a normal workday and work week

---

[1] The Global Assessment of Functioning, or GAF, scale ranges from 0 to 100 and considers psychological, social and occupational functioning on a hypothetical continuum of mental health illness. Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text Rev. 2000) (hereinafter "DSM-IV-TR"). A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id.

Case 5:11-cv-00027-MFU-BWC   Document 18   Filed 04/24/12   Page 3 of 18   Pageid#: 441

without interruptions from psychologically based symptoms. She further opined that McLaughlin is unable to meet competitive standards in three areas and is seriously limited in three additional areas. (R. 300.) Dr. Robinson stated McLaughlin has no useful ability to function in any of the four areas required for semi-skilled and skilled work; that he has no useful functional ability to interact appropriately with the general public; and that he is unable to meet competitive standards in his ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. 301.) Despite the instructions given on the questionnaire, Dr. Robinson failed to "[e]xplain [the] limitations falling in the three most limited categories . . . and include medical/clinical findings that support this assessment," for each of these sections of the assessment. (R. 300-01.)

In an exhaustive decision, the ALJ considered this opinion from Dr. Robinson but gave it limited weight. (R. 24.) Generally, a treating physician's opinion is to be given controlling weight by the ALJ if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."). In determining the weight to give to a medical source's opinion, the ALJ must consider a number of factors, including whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d), 416.927(d). However, "[t]he treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a

4

Case 5:11-cv-00027-MFU-BWC   Document 18   Filed 04/24/12   Page 4 of 18   Pageid#: 442

treating physician if there is persuasive contrary evidence.'" Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

With respect to Dr. Robinson's opinion, the ALJ noted that:

> Even though Dr. R[obinson] is a treating source, she had seen the claimant for only four months when she rendered her opinion. This opinion regarding the claimant's functional mental limitations and conclusion that the claimant is "disabled" is an opinion on an issue that is reserved to the Commissioner and in this case is not entitled to controlling weight or special significance. The undersigned finds that Dr. R[obinson's] opinion carries only limited weight because it conflicts with the medical record as a whole.

(R. 24.) The ALJ went on to state that the evidence of record establishes that McLaughlin engages in activities of daily living that are inconsistent with the degree of limitation expressed in the doctor's opinion, and that "several of the limitations are based on medication side effects as the psychiatrist was working to find the appropriate, effective medications, and the side-effects are temporary." (R. 24.) As detailed below, substantial evidence supports the ALJ's determination that Dr. Robinson's opinion is not entitled to controlling weight.

## A.

The record contains few medical treatment notes generally. Only four such notes in the record are from Dr. Robinson. Dr. Robinson began treating McLaughlin on September 24, 2009, following a referral by his primary care physician. Treatment notes reflect that McLaughlin presented "for treatment of generalized anxiety disorder as well as recurrent depression of a severe nature." (R. 257.) McLaughlin complained of waking up angry in the mornings, poor appetite, excessive sleep, decreased energy, mood swings, and anxiety.[2] Dr. Robinson stated that these symptoms were not consistent with mania, but that some could be consistent with

---

[2] As noted infra, McLaughlin quit taking the Geodon prescribed by his primary care physician for his complaints of mood swings. Therefore, when he presented to Dr. Robinson for the first time in September 2009, he was not taking any medication for his mental impairments. (See R. 264.)

hypomania.[3] (R. 257.) A mental status examination revealed McLaughlin had good grooming and hygiene; good eye contact; decreased psychomotor activity; fair insight and judgment; and no psychotic symptoms or suicidal or homicidal ideations. His speech was described as soft and slow but fluent and spontaneous; his thoughts linear and logical without loose associations or flight of ideas; his mood "depressed;" and his affect dysphoric and restricted. (R. 258.) Dr. Robinson diagnosed McLaughlin with mood disorder, not otherwise specified, as well as generalized anxiety disorder. She pegged his GAF at 50[4] and prescribed Celexa 20mg daily for depression and anxiety. Dr. Robinson noted, "It does appear the patient has a significant amount of money barriers to his level of employment, as well as mood and psychiatric issues which would preclude him from being able to maintain gainful employment." (R. 258.)

McLaughlin returned to see Dr. Robinson on October 20, 2009 with complaints of trouble sleeping since he began taking Celexa. He stated he felt a little less depressed and that his energy levels were improving. However, he reported a lack of appetite, some hypomania, and anxiety and racing thoughts. He said he was interested in a mood stabilizer. (R. 254.) Examination revealed good eye contact and psychomotor activity; normal speech; and linear and logical thoughts without loose associates or flight of ideas. His affect was euthymic and somewhat hypomanic, and his insight and judgment were noted to be "fair to good." Dr. Robinson described his mood as "improving" and raised his GAF to 55.[5] (R. 254.) She continued McLaughlin on Celexa and added Invega 3mg as a mood stabilizer. (R. 255.)

---

[3] Hypomania is an abnormality of mood resembling mania (persistent elevated or expansive mood, hyperactivity, inflated self-esteem, etc.) but of lesser intensity. Dorland's Illustrated Medical Dictionary 895 (30th ed. 2003).

[4] A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR at 34.

[5] See footnote 1, supra.

6

McLaughlin saw Dr. Robinson on November 24, 2009, again complaining of not being able to sleep. He stated that he had a better appetite and was less depressed but had some irritability. Examination revealed he was alert and oriented; his behavior was normal; his eye contact was good; his speech was normal; his mood was better; his thought processes were linear; his insight and judgment were fair; and his affect was euthymic and restricted. (R. 256.) Dr. Robinson diagnosed McLaughlin with a mood disorder, not otherwise specified; rule out bipolar disorder. She raised his GAF to 60[6] and prescribed trazodone to help regulate his sleep cycle. (R. 256.)

On January 19, 2010, Dr. Robinson filled out a mental impairment questionnaire indicating McLaughlin is precluded from all work activity. Her last treatment note in the record is dated approximately one week later, on January 27, 2010. McLaughlin continued to complain about his sleep cycle, stating he was sleeping all the time. He expressed concern about his father's upcoming surgery and his disability hearing. Examination revealed he was alert and oriented; he was fidgety but had fair eye contact; his speech was soft and normal; he had linear thought processes; he was anxious and dysphonic; he had no delusions; and his insight and judgment were fair. (R. 371.) Dr. Robinson diagnosed him with mood disorder, not otherwise specified; rule out bipolar disorder; general anxiety disorder. She lowered his GAF to 53.[7]

In sum, Dr. Robinson saw McLaughlin only three times before filling out the mental impairment questionnaire in which she opines that McLaughlin cannot work. Treatments notes reflect improvement in his condition following his initial visit. His mood was described to be

---

[6] See footnote 1, supra.

[7] See footnote 1, supra. The court notes that while this GAF assessment is lower than indicated at his previous appointment on November 24, 2009, it is slightly higher than noted on the mental impairment questionnaire Dr. Robinson filled out a week earlier on January 10, 2010. There is no explanation in the record for the drop in GAF from 60 to 52 between the appointment on November 24, 2009 and January 19, 2010 when Dr. Robinson filled out the questionnaire.

7

"better" and "improving." Examination revealed good eye contact, normal behavior and speech, linear thoughts, euthymic affect, and fair to good insight and judgment. McLaughlin reported feeling less depressed, having more energy, and having a better appetite after beginning his medication regimen, although he complained about his sleep. To help deal with that issue, Dr. Robinson prescribed Trazodone. Dr. Robinson also prescribed a mood stabilizer at McLaughlin's request. She raised his GAF from 50 to 60, reflecting only moderate symptoms, in the two months following his initial appointment. Despite her statement on the mental impairment questionnaire that McLaughlin suffered three episodes of decompensation[8] within a twelve month period, no such episodes are reflected in her treatment notes.[9] There is no evidence to suggest that McLaughlin was hospitalized as a result of his mental impairments, or that he engaged in any type of intensive therapy. Rather, his treatment has been routine, conservative and medication-based. Although Dr. Robinson noted at his first appointment that McLaughlin has "mood and psychiatric issues which would preclude him from being able to

---

[8] As defined on the mental impairment questionnaire:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).

(R. 302.) This definition is consistent with the one set forth in Listing 12.00, 20 C.F.R. Pt. 404, Subpt. P, App. 1, which goes on to state:

> Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

[9] As noted, Dr. Robinson had only treated McLaughlin for a few months prior to filling out the mental impairment questionnaire. None of her records from these visits document episodes of decompensation of two weeks' duration. And as explained infra, none of the other medical evidence of record documents episodes of decompensation within the previous twelve month period.

8

maintain gainful employment," there is no support for this statement, other than McLaughlin's subjective complaints, in the treatment note in which it appears. And as previously stated, McLaughlin's condition improved over the ensuing months. In short, the severe limitations reflected in the mental impairments questionnaire are simply not borne out in Dr. Robinson's treatment notes.

## B.

Prior to his initial visit with Dr. Robinson, McLaughlin sought mental health treatment only through his primary care physician, and that treatment began just three months prior to his first appointment with Dr. Robinson. Indeed, while McLaughlin alleges an onset date of December 31, 2003, there are no treatment notes in the record prior to 2009. In June 2009, he established a relationship with primary care physicians Kimberly Cheek, M.D., and Shelley Snodgrass, M.D., at Augusta Medical Center. He complained to Dr. Cheek of an infected sore on the back of his head, heartburn and mood swings. At the time, he was not taking any medication for his mental impairments. He stated that he had been on Lexapro in the past for a period of about two months but quit taking it because it "made him dizzy and didn't work." (R. 290.) McLaughlin reported a family history of psychiatric problems. Upon examination, Dr. Cheek noted good eye contact, normal mood and affect, normal recent/remote memory, and normal insight into his health situation. (R. 291.) She diagnosed him with bipolar disorder, prescribed Geodon, and referred him to a psychiatrist.[10] (R. 291-92.)

Dr. Snodgrass and Dr. Cheek continued to treat McLaughlin's head lesion in June and July of 2009. On July 13, 2009, follow-up notes from Dr. Cheek reveal McLaughlin's prescription for Geodon had arrived and that he was to begin taking it immediately. Dr. Cheek

---

[10] Dr. Cheek initially referred McLaughlin to Dr. Darin Christensen, but he was later referred to Dr. Melissa Robinson for financial reasons. (See R. 264.)

further noted that McLaughlin had an appointment with a psychiatrist scheduled in September. (R. 273.) There are no other references to his mental health. On July 27, 2009, he presented with poison ivy and for a follow up of his head lesion. As regards his mental impairments, McLaughlin reported the Geodon knocks him out and that he "is just taking one at night because that is all he can handle right now." (R. 270.) At a follow up appointment on August 17, 2009, he complained of nausea, vomiting and diarrhea. He said he continued to take the Geodon but "it still whips him. He feels exhausted the next day. May stop it." (R. 268.) On September 24, 2009, McLaughlin reported that "[h]e's not been doing well. Says he needs something for anxiety. . . . He stopped the Geodon because it just zonks him out too much." (R. 264.) McLaughlin had an appointment with Dr. Robinson scheduled that same day. The final note in the record from Dr. Cheek is from November 30, 2009. McLaughlin continued to complain of problems regulating his sleep cycle, stating he is up all night and sleeps all day – a complaint he raised with Dr. Robinson at his appointment a week earlier on November 24, 2009. Notes reveal only that Dr. Cheek "encouraged him to be diligent" with respect to following up with Dr. Robinson about his complaints. (R. 261.)

These records from McLaughlin's primary care physicians provide no insight into the extent of the functional limitations caused by his mental impairments and no support for the extreme limitations outlined by Dr. Robinson. The records document his complaints of mood swings and anxiety. They discuss medication management. They contain little in the way of objective findings. And they do not establish that McLaughlin's mental impairments are severe enough to preclude all work activity.

## C.

Likewise, McLaughlin's activities of daily living contradict the degree of limitation set forth on Dr. Robinson's mental health assessment. Crystal Bradford, McLaughlin's girlfriend of seven years, testified at the administrative hearing about how she assists McLaughlin with various tasks that he is unable to perform because he cannot read. For example, she helped him study for the driver's test (R. 54-55), buys certain color shampoo for him since he cannot read the labels (R. 55-56), accompanies him to doctor's visits (R. 58-59), and assists him when using an ATM machine (R. 57-58). However, she stated that McLaughlin is able to walk down to his parents' house and help out with chores, and that he does chores around their house. (R. 60-61.) She further testified that he does:

> [B]asically a lot with [his girlfriend's 3] kids, just talking to them, he can do that. I mean he's really good with the kids, talking to them. But as his homework, a lot of things like that, he relies on me for that. He is a big help with the kids. [laughs]

(R. 61.) Bradford testified that she has been living with McLaughlin for six and half years and that they are "together all the time." (R. 62.)

This testimony is at odds with Dr. Robinson's finding that McLaughlin is unable to function in social realms "due to mood instability, irritability, ruminative/anxious thoughts." (R. 298.) Aside from his learning disabilities, the only aspects of McLaughlin's mental impairments Bradford referenced at the administrative hearing were the fact that he gets nervous around strangers (R. 55), and that he has had trouble regulating his sleep cycle while on his medications. (R. 58.) However, she testified that "[Dr.] Melissa Robinson's right now trying to get him leveled out on things," indicating the sleep issues were temporary and could be resolved with adjustments to his medications. (R. 58.)

11

Also noteworthy is Bradford's testimony that McLaughlin's mental health condition had not changed over the past seven years (R. 61-62), during which time he sought no mental health treatment and took no medication. (R. 186, 187, 203, 204.) Indeed, when McLaughlin applied for disability benefits in 2008, he listed learning disabilities and dyslexia as the only conditions that limit his ability to work. (R. 184.) He stated he had not been seen by a doctor or hospital for these conditions or for any other emotional or mental problems that limit his ability to work. (R. 186, 203.) Dr. Robinson's mental impairment questionnaire is simply not supported by this or the other evidence of record.[11] Therefore, substantial evidence supports the ALJ's determination to give it limited weight.

## III.

Because there was no medical documentation of McLaughlin's condition as of the time he applied for disability benefits, disability determination services referred him for a consultative examination, which was performed by Dr. Cianciolo on December 30, 2008. In his report, Dr. Cianciolo stated that McLaughlin appeared to be able to attend to activities of daily living without assistance and noted that he engages in routine household tasks. Dr. Cianciolo stated McLaughlin:

> is currently taking no medication nor does he have any current medical problems for which he is receiving treatment. The patient has a negative history of inpatient or outpatient psychiatric intervention with the exception of psychological testing and academic testing done in conjunction with his reception of special education services.

(R. 247.)

---

[11] For this same reason, the ALJ had no reason to include in his residual functional capacity assessment a finding that McLaughlin would be off task twenty percent of the workday, which the vocational expert testified would preclude all work. (R. 67.) There is no support for such a limitation in the record.

Dr. Cianciolo observed that McLaughlin was cleanly attired and his grooming and hygiene appeared to be adequate. His speech was relevant, coherent, of normal volume and tone, and spontaneous; eye contact was good with sporadic offgazing; and his mood appeared to be anxious, which was noted to be a function of situation, and his affect constricted. McLaughlin was alert and fully oriented and showed no signs of hallucinatory activity, delusions, evidence of suicidal ideation or homicidal ideation. His insight and judgment appeared to be appropriately developed; his thoughts were logical, goal-directed, and centered about the current evaluation. (R. 248.)

Testing revealed a performance IQ score of 89 and a full scale IQ score of 80, both of which fell within the low average range, and a verbal IQ score of 76, which fell within the borderline range. (R. 248.) Dr. Cianciolo noted that "[t]he discrepancy between verbal and perceptual abilities is statistically significant, indicative of uneven cognitive functioning. This pattern is consistent with the patient's presented complaint." (R. 248.) Dr. Cianciolo diagnosed him with a learning disorder, not otherwise specified, and a global assessment of functioning (GAF) score of 70.[12] Dr. Cianciolo found that McLaughlin is capable of performing simple or repetitive tasks, but his ability to perform detailed or complex tasks appears to be markedly impaired. His abilities to maintain regular attendance, perform work activities on a consistent basis, and complete a normal workday or work week without interruption from psychiatric illness are relatively unimpaired. His ability to interact with coworkers and the public as well as cope with routine stressors encountered in competitive work also appear to be relatively unimpaired. Dr. Cianciolo stated that he appears capable of accepting instructions from

---

[12] A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV-TR at 34.

Case 5:11-cv-00027-MFU-BWC   Document 18   Filed 04/24/12   Page 13 of 18   Pageid#: 451

supervisors. However, Dr. Cianciolo noted that "[i]t is likely that he would require special or additional supervision at the workplace, especially if prescribed tasks require that the patient read or complete paperwork." Dr. Cianciolo noted neither inpatient nor outpatient psychiatric treatment was indicated. (R. 249.)

Following this consultative examination, two state agency physicians, Drs. Kalil and Sampson, reviewed the records and opined that McLaughlin is not precluded from all work activity. Dr. Kalil opined on January 8, 2009 that McLaughlin has moderate restriction of activities of daily living and moderate difficulties in maintaining social functioning, but no difficulties in maintaining concentration, persistence or pace or repeated episodes of decompensation. (R. 78, 89.) Dr. Sampson opined on April 30, 2009 that McLaughlin has mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace, with no repeated episodes of decompensation. (R. 101.) Both of these reviewing physicians found McLaughlin has the residual functional capacity to perform his past relevant work as a fence installer. (R. 82, 105.)

In his Report and Recommendation, the magistrate judge agreed with the position taken by McLaughlin on appeal that the consultative and record review evidence before the ALJ at the time he made his decision fails to substantially support his determination to deny benefits. The magistrate judge held:

> The undersigned is of the view that the assessments and opinions provided by State agency record reviewing experts and the consultative examiner do not constitute substantial evidence on the record before the court. These reviews and the examination were performed **prior** to the critical assessment provided by psychiatrist Dr. Robinson. Thus, neither the State agency record reviewing experts nor the consultative examiner had [the] benefit of Dr.

14

> Robinson's opinions before rendering the very assessments relied on by the Law Judge to deny benefits.
>
> That raises the question of whether the Commissioner should be given an opportunity to reexamine the claim in light of Dr. Robinson's evidence. One could conclude that such an opportunity has been available all along which the Commissioner deliberately by-passed. While the plaintiff seeks reversal on this record, which the undersigned is tempted to recommend, the better option is to remand the case to the Commissioner with direction to either conduct further proceedings in which the consulting source could supplement their reports or to grant benefits.

Report & Recommendation, Dkt. # 16, at 7. The court disagrees.

It is not the province of a federal court to make administrative disability decisions. The court's job is to determine whether substantial evidence supports the Commissioner's disability decision. To that end, the court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet her burden of proving disability. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

Substantial evidence supports the Commissioner's decision to adopt the opinions of the state agency physicians and the consultative examiner over the opinion of the treating

15

psychiatrist. The ALJ did not blindly rely on the opinions of the reviewing physicians and the consulting examiner. Rather, in an exhaustive opinion, the ALJ analyzed all of the relevant evidence and explained his reasoning for giving more weight to these three opinions. "It is the ALJ's responsibility to weigh the evidence in order to resolve any conflicts which might appear therein. 'Thus it is not within the providence of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgments for that of the [ALJ] if his decision is supported by substantial evidence.'" Parker v. Astrue, No. 3:10CV558, 2011 WL 3585373, at *7 (E.D. Va. 2011) (quoting Hays v. Sullivan, 907 F.2d 1452, 1456 (4th Cir. 1990) and citing Taylor v. Weinberger, 528 F.2d 1153, 1156 (4th Cir. 1975)), adopted by 2011 WL 3607015 (E.D. Va. Aug. 16, 2011).

Plaintiff argues, and the magistrate judge agrees, that "the ALJ's findings were not based on substantial evidence because the three medical consultants the judge relied on based their opinions on an incomplete record." Pl.'s Br., Dkt. # 12, 4-5. But the record was not incomplete. At the time McLaughlin applied for disability benefits, he had not sought mental health treatment and thus had no medical records reflecting any such treatment. The Commissioner satisfied his duty to develop the record by ordering a consultative examination. See 20 C.F.R. §§ 404.1519a, 416.919a. Moreover, the fact that Dr. Robinson's mental capacity assessment was performed after the consultative examination and review by the state agency physicians is of no moment. The ALJ considered in detail the treatment records and the mental capacities assessment of Dr. Robinson. The fact that the consultative examiner and the state agency physicians may not have considered Dr. Robinson's records does not render the ALJ's reliance on those opinions irrational. Parker, 2011 WL 3585373, at *8. The consultative examiner, Dr. Cianciolo, had the opportunity to interview and examine McLaughlin in preparing his Psychological Assessment.

16

Testing revealed a significant discrepancy in cognitive function, but Dr. Cianciolo did not find that McLaughlin is unable to work as a result of his mental impairments. This opinion, and the opinions of the state agency physicians, are more consistent with the record evidence as a whole than is the mental impairments questionnaire from Dr. Robinson. For the vast majority of the relevant period, McLaughlin sought no treatment whatsoever. When he did seek treatment in 2009, he was treated conservatively with medication. His prescriptions were adjusted as necessary to control his alleged mood swings and help regulate his sleep cycle.

The ALJ took into account the limitations on McLaughlin's ability to work that are documented in and supported by the record. He limited McLaughlin to simple, unskilled work with only occasional interaction with the public, coworkers and supervisors, and required any such work be consistent with a marginal educational and/or being illiterate. (R. 21.) Substantial evidence supports this residual functional capacity assessment and the Commissioner's ultimate determination that McLaughlin is not disabled.

## IV.

As such, the court cannot agree with the magistrate judge's finding that the ALJ's decision to adopt the opinions of the reviewing physicians and the consultative examiner over Dr. Robinson's opinion is not supported by substantial evidence. Remand is not appropriate given this record.

17

To that end, an Order will be entered rejecting the Report and Recommendation of the magistrate judge in its entirety and affirming the Commissioner's decision.

Entered: April 24, 2012

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

18